UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

          Plaintiff,          Case No. 17-20053

v.

                              Honorable Stephen J. Murphy, III

D-4 Fard Mallory,

          Defendant.

**Government's Response in Opposition to Defendant's Motion for Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (R. 327)**

      Defendant Fard Mallory was convicted twice for trafficking or possessing drugs and served significant prison time before he once again reoffended and repeatedly distributed multiple kilograms of cocaine in this case. The Court sentenced him to ten years in prison. (R. 197: Judgment). Mallory reported to the Bureau of Prisons (BOP) on January 15, 2019. He is an inmate at Federal Correctional Institution (FCI) Loretto in Pennsylvania where BOP reports that there are no confirmed cases of COVID-19. He has served less than 18 months of a ten year sentence. Even with credit for good time he is not due to be released until July 21, 2027. He has now asked the Court to resentence him to home confinement. The Court cannot resentence him as requested. The BOP has exclusive authority to determine who is released to home confinement. Nor does Mallory qualify for compassionate release. As a threshold matter, compassionate

release requires a defendant exhaust his administrative remedies. This requirement cannot be waived by the Court as he suggests. *United States v. Alam*, No. 20-1298 ___F.3d___, 2020 WL 2845694 (6th Cir. June 2, 2020). Instead, Mallory filed his motion prematurely before he requested release from with the BOP.

Mallory does not satisfy the statutorily mandated criteria for compassionate release. His lengthy repeated criminal history and the nature of the offense itself make him a danger to the community, which forecloses relief under USSG § 1B1.13(2). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Mallory fails to meet the criteria in USSG § 1B1.13. Likewise, § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)— do not support release. His motion should be denied.

## Background

DEA agents identified Mallory as a kilogram-level cocaine distributor. Mallory obtained his drugs in Detroit from large-scale distributors Darryl and Jerome Terrell. After Mallory received cocaine from the Terrells he sold it to his nephew Kaylor Brown, who he met at the Hollywood Casino in Toledo, Ohio, on at least seven occasions. (Presentence Investigation Report (PSR) ¶¶ 17-18). Following their last meeting on June 9, 2016, officers stopped Brown and seized the three kilograms of cocaine Mallory had just sold him. (*Id.* ¶ 17). Review of

surveillance video at the Hollywood Casino showed six other carefully coordinated meetings. Over the course of six months, between December 2015 and June 2016, Mallory met his nephew on an almost monthly basis to sell him cocaine. Mallory and his nephew would always meet in the casino's parking structure, entering the casino only briefly and often times not at all. They met momentarily, parking next to each other. Brown would typically enter Mallory's car with a bag, presumably the cash, and exit with another bag with the drugs. They would then both go their separate ways.

On June 4, 2018, Mallory pleaded guilty to conspiracy to distribute more than five kilograms of cocaine. (R.162: Plea Agreement). On December 7, 2020, this Court sentenced him to 120 months in prison (R. 197: Judgment). On January 15, 2019, Mallory reported to the BOP. He has served less than 18 months of his ten years sentence. Mallory did not attempt to exhaust his administrative remedies before petitioning the Court for compassionate release. Instead, Mallory filed the instant motion on May 1, 2020, and then petitioned the BOP for compassionate release on or about May 14, 2020. BOP denied his request on May 29, 2020.

## Argument

### I. The Court cannot resentence Mallory to home confinement.

A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). The

statutory exceptions to this rule are narrow and are only permissible when there is a retroactive change to the guideline range or it is expressly permitted by statute. 18 U.S.C. § 3582(c)(1) and (c)(2). Mallory's request for resentencing to home confinement does not fall within any of the statutory exceptions. The BOP, not the sentencing court, has the exclusive authority to determine a person's place of incarceration – including home confinement. Such a decision "is not reviewable by any court." 18 U.S.C. § 3621(b). The CARES Act did not alter this authority. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). Courts in this district have also recognized that under the CARES Act the authority to transfer an inmate to home confinement remains solely allocated to the BOP. See *United States v. Oliver*, 17-CR-20489, 2020 WL 2768852 (E.D. Mich. May 28, 2020) (Berg, J) (citing cases). Therefore, the Court cannot grant Mallory's requested relief to modify his sentence and direct the BOP to release him to home confinement. (R. 327: Defendant's Motion: 1885-86). This is especially true now, given the BOP's substantial and ongoing efforts to address the COVID-19 pandemic.

### A. The BOP's precautions have mitigated the risk from COVID-19 within its facilities.

The BOP has reacted quickly to confront COVID-19's spread within its facilities. For over almost a decade, the BOP has maintained a [detailed protocol](detailed protocol) for responding to a pandemic. Consistent with that protocol, the BOP began modifying

4

its operations to implement its COVID-19 Action Plan and minimize the risk of transmission into and inside its facilities. *See* BOP COVID-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the BOP has repeatedly revised its plan. To stop the spread of the disease, the BOP has restricted inmate movement within and between facilities. *See Id.* Only limited group gathering is allowed, social and legal visits have been suspended, but inmates have been permitted an additional 500 minutes per month for calls. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Newly admitted inmates and staff are screened. High risk asymptomatic and symptomatic inmates are quarantined. Staff are screened for symptoms and placed on leave if necessary.

Like all other institutions, penal and otherwise, the BOP has not been able to eliminate the risks from COVID-19 completely, despite its best efforts. But the BOP's measures will help federal inmates remain protected from COVID-19 and ensure that they receive any required medical care during these difficult times.

**B.     The BOP is increasing the number of inmates who are granted home confinement.**

The BOP has also responded to COVID-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the BOP to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the COVID-19 pandemic. CARES

Act, § 12003(b)(2). The Attorney General has also issued two directives, ordering the BOP to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the BOP to identify the inmates most at risk from COVID-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The BOP's efforts on this point are not hypothetical. Over 4,010 federal inmates have been granted home confinement since the COVID-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to COVID-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting COVID-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the COVID-19 pandemic far better than any other solution does. The BOP cannot open its

facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for COVID-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring COVID-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The BOP' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The BOP's home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the BOP must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting COVID-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the BOP to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the [BOP]."). It is especially true now, given the BOP's substantial and ongoing efforts to address the COVID-19 pandemic.

## II.  Mallory does not qualify for compassionate release.

Just like a court's authority to modify a defendant's previously imposed sentence is narrowly circumscribed, compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

Compassionate release requires exhaustion. Because this requirement is a statutory one and not judicially crafted, it is mandatory. By failing to exhaust his administrative remedies before filing the instant motion, Mallory implored the Court to ignore the statute's mandatory exhaustion requirement. But doing so is not permitted by Sixth Circuit case law.

Even if a defendant is eligible for compassionate release, the district court may not grant the motion if he is "a danger to the safety of any other person or to

8

the community," and the factors in 18 U.S.C. § 3553(a) –defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public – do not support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13.

Mallory remains a danger and the sentencing factors weigh against him. His motion should be denied.

### A. Mallory has not exhausted his administrative remedies.

Until recently, only the BOP could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

The provision permitting a defendant-initiated motion includes an exhaustion requirement. A district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the BOP or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A). The Sixth Circuit has affirmed that exhaustion is mandatory, and cannot be excused even in light of the COVID-19 pandemic. *United States v. Alam*, No. 20-1298 \_\_\_F.3d\_\_\_, 2020 WL 2845694 (6th Cir. June 2, 2020). In *Alam*, the Court acknowledged time is always of the essence for

prisoners applying for compassionate release and diseases with the morbidity of COVID-19 arise only occasionally, but to craft exceptions to the [exhaustion] rule, "would make nearly every prisoner eligible…to jump the line of applications – making the process [for application for compassionate release] less fair." *Id*. at *4.

Mallory failed to exhaust his administrative remedies before filing his motion. Mallory submitted a request to his warden under § 3582 on May 14, 2020, and the warden denied it on May 29, 2020. This is still not exhaustion because a petitioner has the right to appeal that decision within the BOP. Program Statement 5050.50, ¶ 9; 28 C.F.R. § 542, subpart B (Administrative Remedy Procedure); § 571.63 (adapting procedure to First Step Act). Mallory may seek relief from the sentencing court once his appeal has concluded or 30 days has lapsed from the date of his initial request, whichever comes earlier. 28 C.F.R. § 571.63. That means Mallory is likely to have exhausted his administrative remedies on June 14, 2020. But the Court does not need to require Mallory to refile. Instead, his motion should be denied because he does not otherwise meet the criteria for compassionate release.

### B. Mallory remains a danger to the community and should not be granted compassionate release.

Even if Mallory had properly exhausted his administrative remedies before filing his motion, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the

Sentencing Commission." 18 U.S.C. § 3582 (c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-

11

CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 limits compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the [BOP]," which the BOP has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The COVID-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from COVID-19 to Mallory and other inmates. Thus, as the Third Circuit has explained, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597.

Mallory asserts that he is particularly at risk from COVID-19 because he has diabetes and hypertension. Mallory has been diagnosed with essential (primary) hypertension. (Gov. Sealed Ex. 1: BOP Medical Records, p. 4, 10-12, 69, 83, 138). In other words, he has high blood pressure. This is *not* the same condition as pulmonary hypertension, which is a CDC-recognized high risk factor. The CDC lists "pulmonary hypertension" as a "serious heart condition" that may place individuals at greater risk. *Id*. But Mallory does not have pulmonary hypertension or does not explain how his form of hypertension, manifested by high blood pressure, places him at particular risk for complications or greater harm. As one court has noted, "at best, the evidence regarding non-pulmonary hypertension is unclear." *Malam, et al v. Alducci*, 20-10829 (E.D. Mich. May 12, 2020), at p. 22.

The CDC does recognize that diabetes, "particularly if not well controlled," is a higher risk factor for COVID-19. Mallory was diagnosed in 2014 as a Type II diabetic, but is not insulin dependent and is able to control his condition with medication. (Gov. Sealed Ex. 1: BOP Medical Records, p. 35, 83). Under the current conditions caused by COVID-19, Mallory's diabetes is an "extraordinary and compelling" reason for release, because it substantially diminishes his ability in prison to provide self-care against serious injury or death as a result of COVID-19. U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

But even if a combination of Mallory's medical conditions and the COVID-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Mallory is still ineligible for compassionate release because he is a danger to the community. And this Court has denied motions for compassionate release for defendants who have raised concerns about hypertension or diabetes. See *United States v. Shah*, No. 16-20457, 2020 WL 1934930 (E.D. Mich. Apr. 22, 2020) (Cleland, J.); *United States v. Benchick*, No. 13-20453, 2020 WL 2847456 (E.D. Mich. June 2, 2020) (Cleland, J.); *United States v. Qazi*, No. 16-20437, 2020 WL 2526118 (E.D. Mich. May 18, 2020) (Cleland, J.); *United States v. Smith*, No. 13-cr-20495, (E.D. Mich. Apr. 22, 2020) (Borman, J).

Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). The Sixth Circuit has made clear even run of the mill drug dealers without any indication they are engaged in violence are dangerous – "drug trafficking is a serious offense that, in itself poses a danger to the community. *Id.* at 955. Section 1B1.13(2) also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United*

*States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders—such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2).

Mallory has a long criminal history that includes multiple lengthy prison sentences. Rather than reform himself, Mallory always resumed his criminal activity. Mallory previously served 87 months for conspiring to distribute heroin. He then violated the terms of his supervised release. Mallory returned to prison for at least 16 months after he failed to stop at the scene of an accident that resulted in another's serious impairment/death. (PSR ¶ 35-36). In 2001 he was convicted for possessing narcotics. (*Id*. ¶ 37). Mallory admitted at the time that he had a long history of substance abuse, including daily use of cocaine, crack, heroin, and oxycodone pills. (*Id*. ¶ 58). At one point while he was on bond for this case, he tested positive for opiates. (*Id*. ¶ 59).

In this case, Mallory repeatedly obtained multiple kilograms of cocaine that he distributed to his nephew on at least seven occasions. On the one occasion when officers stopped Mallory's nephew he had just purchased three kilograms of cocaine from Mallory, worth more than $100,000 (based on a value of $36,000 per kilogram). Considering Mallory's other sales to his nephew, he likely distributed

15

more than half a million dollars of cocaine in just six months. Mallory is not just a run of the of mill drug dealer that even the *Stone* case deemed dangerous.

### C. The factors in 18 U.S.C. § 3553(a) weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. U.S.S.G. § 1B1.13; *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Mallory eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Mallory's offense was serious – so serious that Congress imposed a mandatory sentence of ten years. Mallory just reported to BOP on January 15, 2019. He has only served less than 18 months of a ten year sentence. Granting Mallory compassionate release at this point would lead to an unwarranted

sentencing disparity, improperly minimize the seriousness of his drug trafficking offense, and undermine the deterrent effect of such a prison sentence.

And Mallory's history shows he is someone who is not deterred. He repeatedly committed new criminal offenses and continued to engage in criminal activity into his 50s, dispelling the commonly advanced argument that his more mature age made his less of a danger and less likely to commit new crimes.

Therefore, the § 3553(a) factors independently bar his request for relief.

### III. If the Court were to grant Mallory's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Mallory's motion despite the government's arguments above, Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Mallory's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ *Andrea Hutting*
Andrea Hutting
Craig F. Wininger
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI 48226
313-226-9110 phone

                                        andrea.hutting@usdoj.gov
                                        P68606

Dated: June 11, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2020, I electronically filed the foregoing document with the Clerk of the Court Eastern District of Michigan using the ECF system, which will send notification of such filing to all users of record.

I further certify that on June 12, 2020, I will have mailed the foregoing document by USPS to the following non-ECF participant:

Fard Mallory
#02322-190
Federal Prison Camp
P.O. Box 1000
Cresson, PA 16630

                s/*Andrea Hutting*
                Andrea Hutting
                Assistant United States Attorney
                211 W. Fort Street, Suite 2001
                Detroit, MI 48226
                313-226-9110 phone
                andrea.hutting@usdoj.gov